## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

RODERICK CLINTON JENKINS, :
 :
   Plaintiff : No. 4:10-CV-2410
 :
   v. : (Judge Nealon)
 :
MICHAEL J. ASTRUE, :
COMMISSIONER OF SOCIAL :
SECURITY, :
 :
   Defendant :

FILED
SCRANTON
DEC 28 2011
PER _____
DEPUTY CLERK

### MEMORANDUM AND ORDER

### BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Roderick Clinton Jenkins's claim for social security supplemental security income benefits. For the reasons set forth below the decision of the Commissioner will be affirmed.

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Jenkins was born in the United States on December 13, 1972. Tr. 149.[1] Jenkins attended regular education classes until he was taken out of school and incarcerated during the twelfth grade. Tr. 55, 169 and 177. Jenkins testified at the administrative hearing which was held in this case on June 16, 2009, that he did not obtain a General Equivalency Diploma (GED). Tr. 55. However, he previously told Ali Nourian, M.D., who examined Jenkins on behalf of the Bureau of

---

1. References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on January 31, 2011.

Disability Determination[2] that he obtained his GED while incarcerated. Tr. 298.  Jenkins admitted that he can read, write, speak and understand the English language. Tr. 167 and 201.

The record reveals that Jenkins has a long history of criminal activity as well as a history of using cocaine, crack and marijuana. Tr. 248, 258, 408, 413 and 494-495.  His criminal history includes convictions for aggravated assault and drug trafficking. Id.  He reported that he last used cocaine and marijuana in early 2006. Tr. 489 and 494.

Jenkins has a limited work and earnings history.  Tr. 157-163.  He has past work experience as a dishwasher, packer, construction worker, and a telemarketer. Tr. 169.  He also worked for various temporary employment agencies. Id.  Records from the Social Security Administration indicate that he worked in 1987 earning $257.95, 1992 earning $1264.80, 1993 earning $1403.43, 1994 earning $2098.74, 1998 earning $6221.29, 1999 earning $9170.79, 2000 earning $7446.85, 2001 earning $520.00, 2006 earning $11,456.00, and 2007 earning $327.25. Tr. 157.  His total earnings were $40,167.10. Id.  A vocational expert testified that all of Jenkins's past employment was unskilled, sedentary to medium work.[3] Tr. 75-76.

---

2.   The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for SSI benefits on behalf of the Social Security Administration.  Tr. 92.

3.   The terms sedentary, light and medium work are defined in the Social Security regulations as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work.* Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg

(continued...)

On February 27, 2007, Jenkins protectively filed[4] an application for supplemental security income benefits. Tr. 13, 149-156 and 197.  Jenkins alleges that he became disabled on October 1, 2002, because of an HIV infection and mental illness. Tr. 91 and 168.  He contends he has blackouts, seizures, migraines and fatigue. Id.  The record reveals that Jenkins last worked in 2008. Tr. 15.  In that year Jenkins started a masonry business. Id.  The administrative law judge found that this work was substantial gainful activity but that because it "was short-lived and ceased" it "would likely be considered an unsuccessful attempt to return to work." Tr. 15.

Jenkins's alleged disability onset date of October 1, 2002, has no impact on Jenkins's application for supplemental security income benefits because supplemental security income is a needs based program and benefits may not be paid for "any period that precedes the first month following the date on which an application is filed or, if later, the first month following the date all conditions for eligibility are met." See C.F.R. § 416.501.  Consequently, Jenkins is not eligible for SSI benefits for any period prior to March 1, 2007.

---

3.    (...continued)
        controls.  To be considered capable of performing a
        full or wide range of light work, you must have the
        ability to do substantially all of these activities.
        If someone can do light work, we determine that he or
        she can also do sedentary work, unless there are
        additional limiting factors such as loss of fine
        dexterity or inability to sit for long periods of time.

        (c) *Medium work*.  Medium work involves lifting no more
        than 50 pounds at a time with frequent lifting or
        carrying of objects weighing up to 25 pounds.  If
        someone can do medium work, we determine that he or she
        can do sedentary and light work.

20 C.F.R. § 416.967.

4.    Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

On June 13, 2007, the Bureau of Disability Determination denied Jenkins's application for SSI. Tr. 13 and 91-95.  On August 13, 2007, Jenkins requested a hearing before an administrative law judge. Tr. 96.  After approximately 22 months had passed, a hearing was held on June 16, 2009, before an administrative law judge. Tr. 25-81.  On June 25, 2009, the administrative law judge issued a decision denying Jenkins's application for SSI benefits. Tr. 13-24.  On August 21, 2009, Jenkins filed a request for review of the decision with the Appeals Council of the Social Security Administration. Tr. 7-9.  After 13 months had passed, the Appeals Council on September 21, 2010, concluded that there was no basis upon which to grant Jenkins's request for review. Tr. 1-4.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On November 19, 2010, Jenkins filed a complaint in this court requesting that we reverse the decision of the Commissioner denying him supplemental security income benefits.  The Commissioner filed an answer to the complaint and a copy of the administrative record on January 31, 2011.  Jenkins filed his brief on April 15, 2011, and the Commissioner filed his brief on May 18, 2011.  The appeal[5] became ripe for disposition on June 6, 2011, when Jenkins elected not to file a reply brief.

**Standard of Review**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the

---

5.    Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails

to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting

certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court

reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v.

Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir.

1979).

**Sequential Evaluation Process**

        To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

        The Commissioner utilizes a five-step process in evaluating supplemental security income

claims.  See 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the

Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful

activity,[6] (2) has an impairment that is severe or a combination of impairments that is severe,[7] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[8] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual

---

6. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 416.910.

7. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 416.923 and 416.945(a)(2).

8. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Records**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail some of the medical records.  The medical records reveal that Jenkins's HIV infection was well-controlled and his mental status good.  We will commence with a medical record dated March 31, 2006, which was eleven months before Jenkins filed his application for SSI benefits.

On March 31, 2006, Jenkins was evaluated by a psychiatrist[9] at the Scranton Counseling Center, Scranton, Pennsylvania. Tr. 241-256.  During that evaluation Jenkins admitted his history of drug and alcohol abuse and stated that his drug of choice was crack. Tr. 247.  Jenkins further stated that he last used drugs or alcohol six months prior to the evaluation. Id.  He also revealed his criminal history. Tr. 248.

A mental status examination by the psychiatrist was essentially normal. Tr. 252.  It was observed that Jenkins had no abnormal movements or behavior of any kind; Jenkins was cooperative and his speech was normal, his affect was appropriate and his thought processes were coherent; Jenkins denied any unusual feelings, experiences, beliefs, paranoid thoughts or grandiose ideas and no psychotic thought processes of any kind were noted; Jenkins denied any kind of obsessive compulsive behavior, he denied any suicidal or homicidal ideations, and he denied any kind of hallucinations or illusions. Tr. 252-253.  Jenkins was oriented to person, place and time, his memory was intact, his concentration was adequate, and he had good judgment. Id.  Jenkins further denied any problems with impulse control. Id.  The only negative observations were that his mood was anxious and he had limited insight regarding his problems. Id.

_____

9 .    The signature of the psychiatrist is illegible. Tr. 256.

The psychiatrist concluded that Jenkins suffered from impulse control disorder, not otherwise specified and could not rule out bipolar disorder and antisocial personality disorder. Tr. 254. He further gave Jenkins a Global Assessment of Functioning (GAF) score[10] of 60, representing moderate symptoms and 1 point below the mild symptom range. Id. Jenkins was prescribed Depakote[11] and Celexa.[12] Tr. 256.

On April 21, 2006, Jenkins had an appointment at the Scranton Counseling Center. Tr. 235 and 511. A mental status examination on that date was normal. Id. Jenkins's mood was euthymic[13] and his affect appropriate; he was friendly, alert, cooperative, and his concentration and attention were good; he was oriented and non-psychotic; he denied drug and alcohol use; he denied homicidal and suicidal ideations; and he stated that his medications were helpful. Id. He further

---

10.    The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id. A GAF score of 71 to 80 represents transient symptoms, if present, and expectable reactions to psychosocial stressors or no more than slight impairment in social, occupational, or school functioning. Id.

11.    The drug Depakote (divalproex sodium) is used to treat "mania or mixed episodes associated with bipolar disorder (manic depressive disorder)[.]" Valproic acid, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677/ (Last accessed December 21, 2011).

12.    "Celexa (citalopram) is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs)." Celexa, Drugs.com, http://www.drugs.com/celexa.html (Last accessed December 21, 2011).

13.    Euthymic is defined as "pertaining to a normal mood in which the range of emotions is neither depressed nor highly elevated." Mosby's Medical Dictionary, 8th edition, 2009. http://medical-dictionary.thefreedictionary.com/euthymic (Last accessed December 22, 2011).

stated that "all is well when he is on his meds." Id. Jenkins reported no side effects from his medications. Id.

On May 23, 2006, Jenkins had an appointment at Scranton Temple Residency Program Faculty Service, Scranton, regarding his HIV infection. Tr. 290-291.  The attending physician was Stephen J. Pancoast, M.D. Id.  It was noted that Jenkins was taking no HIV medications and he was asymptomatic. Id.  His last CD4 count was 373[14] and his last viral load was less than 4000.[15] Id. When Dr. Pancoast or a nurse conducted a review of Jenkins's systems[16] Jenkins denied the following: constitutional,[17] eye, nasal, cardiovascular, respiratory, gastrointestinal, urinary, skin,

---

14.   "CD4 cells are a type of white blood cell that fights infection. Another name for them is T-helper cells. . . The CD4 count measures the number of CD4 cells in a sample of blood . . . Along with other tests, the CD4 count helps tell how strong your immune system is, indicates the stage of your HIV disease, guides treatment, and predicts how your disease may progress. . . A normal CD4 count is from 500 to 1,500 cells. . . Public health guidelines recommend starting on preventive antiretroviral therapy if CD4 counts are under 200, whether or not you have symptoms." HIV,AIDS and the CD4 Count, WebMD, http://www. webmd.com/hiv-aids/cd4-count-what-does-it-mean (Last accessed December 21, 2011).

15.   HIV viral load is an important measurement of the amount of active HIV in the blood of someone who is HIV positive and also indicates if the individual's medication regimen is working.  HIV Viral Load - What Is It and Why Is It Important? About.com, http://aids.about.com/od/technicalquestions/f/viralload.htm (Last accessed November 16, 2011). Viral load measurements range from less than 50 copies to greater than 750,000 copies.

16.   "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/ clinicalmed/ros.htm (Last accessed December 21, 2011).

17.   Constitutional symptoms are symptoms that affect the general well-being of a patient and include weight loss, vomiting, fevers, fatigue, chills, night sweats and decreased appetite. See Cunningham W.E., et al., Constitutional symptoms and health-related quality of life in patient with symptomatic HIV disease, Am.J. Med, 1998 Feb; 104 (2); 129-36, http://www.ncbi.nlm.nih. gov/pubmed/9528730 (Last accessed December 22, 2011). "More than 50 percent of people with the human immunodeficiency virus, or HIV, report experiencing constitutional symptoms." Rachel Ahmed, Constitutional Symptoms of HIV (Sept. 2, 2010), Livestrong.com, http://www.livestrong.com/article/220330-constitutional-symptoms-of-hiv/ (Last accessed December 22, 2011). Ms. Ahmed has a Master of Science degree in integrated biomedical science with an emphasis in molecular and cellular biology from the University of Kentucky College of Medicine. Id.

hair, nail, neurologic and hematologic symptoms. Tr. 290. He told either the nurse or Dr. Pancoast that he suffered from bipolar disorder or schizophrenia. Id. A physical examination of Jenkins revealed normal findings. Tr. 290-291. At this appointment Jenkins stated that he had not used cocaine or crack for six months. Id.[18]

On June 6, 2006, Jenkins had an appointment at the Scranton Counseling Center. Tr. 436. A mental status examination on that date was normal. Id. Jenkins's mood was euthymic and his affect was appropriate; he was friendly, alert, cooperative, and his concentration and attention were good; he was oriented and non-psychotic; he denied drug and alcohol use; he denied homicidal and suicidal ideations; and he stated that his medications were helpful. Id. He further stated that he was not always compliant with his medications. Id. Jenkins reported no side effects from his medications. Id.

On June 21, 2006, Jenkins was examined by Ali Nourian, M.D, on behalf of the Bureau of Disability Determination. Tr. 298-301. Dr. Nourian found that Jenkins only had moderate limitations in his mental functioning. Id.

On July 5, 2006, Joseph A. Barrett, Ph.D., a psychologist, reviewed Jenkins's medical records on behalf of the Bureau of Disability Determination and concluded that Jenkins suffered from bipolar disorder, not otherwise specified. Tr. 306. Dr. Barrett further found that Jenkins was only moderately limited in his ability to carry out detailed instructions and respond appropriately to changes in the work setting. Tr. 316-317. Dr. Barrett also found that Jenkins was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." Tr. 318.

---

18.   This statement is inconsistent with his statement on March 31, 2006, that he had not used illegal drugs for six months.

On July 5, 2006, Jenkins had an appointment at the Scranton Counseling Center. Tr. 434. A mental status examination on that date was normal. Id. Jenkins's mood was euthymic and his affect was appropriate; he was friendly, alert, cooperative, and his concentration and attention were good; he was oriented and non-psychotic; he denied drug and alcohol use; he denied homicidal and suicidal ideations; and he stated that his medications were helpful. Id. Jenkins reported no side effects from his medications. Id. He further stated that he was having "relationship problems [with] 42 yo girlfriend." Id.

On August 17, 2006, Jenkins had an appointment at the Scranton Counseling Center. Tr. 432. A mental status examination on that date was essentially normal. Id. Jenkins's mood was friendly and irritable and his affect was appropriate; he was alert, cooperative, and his concentration and attention were good; he was oriented and non-psychotic; he denied drug and alcohol use; he denied homicidal and suicidal ideations; and he stated that his medications were helpful. Id. Jenkins reported no side effects from his medications. Id.

On September 23, 2006, Jenkins had a chest x-ray which revealed no acute pulmonary disease and on September 25, 2006, he had a CD4 count of 350. Tr. 338 and 360.

On October 24, 2006, Jenkins had an appointment at the Scranton Counseling Center. Tr. 430. A mental status examination on that date was normal. Id. Jenkins's mood was euthymic and his affect was appropriate; he was friendly, alert, cooperative, and his concentration and attention were good; he was oriented and non-psychotic; he denied drug and alcohol use; he denied homicidal and suicidal ideations; and he stated that his medications were helpful. Id. Jenkins reported no side effects from his medications. Id.

On November 14, 2006, Jenkins had an appointment at Scranton Temple Residency Program Faculty Service, Scranton, regarding his HIV infection. Tr. 413-414. The attending

12

physician was Dr. Pancoast. Id.  It was noted that Jenkins's last CD4 count was 351 and his viral load was 3842. Id.  Jenkins denied any associated signs and symptoms. Id.  When Dr. Pancoast or a nurse conducted a review of Jenkins's systems he denied the following: constitutional, eye, nasal, cardiovascular, respiratory, gastrointestinal, urinary, skin, hair, nail, neurologic, psychiatric and hematologic symptoms. Tr. 413.  A physical examination of Jenkins revealed essentially normal findings.[19] Tr. 468-469.

On December 22, 2006, Jenkins was admitted to the psychiatric unit of First Hospital Wyoming Valley, Kingston, Pennsylvania. Tr. 406-412.  At admission Jenkins's chief complaint was as follows: "I was having problems with depressed mood and anger and thinking about hurting myself and others which I don't want to, so I came here." Tr. 408.  Jenkins was diagnosed with impulse control disorder, not otherwise specified; depressive disorder, not otherwise specified; and family problems. Tr. 406.  Jenkins received psychotherapy and was prescribed the drugs Prozac and Depakote and discharged from the hospital after 4 days. Tr. 406.  The discharge summary stated in pertinent part as follows: "Upon admission, the patient presented himself as reasonable, cooperative and admitting that he does have problems with anger, tendency to be explosive and problems at home with his wife's 24 year-old son. The patient showed no evidence of psychotic features, mood fluctuation, dementia or delirium. . . Since presenting symptomatology is improved and his desire to continue outpatient treatment by local mental health center, it is felt that the patient gained hospital benefit and he was released after four days of hospital stay." Id.  During his stay at the hospital Jenkins also had a physical examination which revealed no abnormal findings. Tr. 407.

---

19.    Jenkins's blood pressure was slightly elevated at 136/90.

On January 11, 2007, Jenkins had an appointment at the Scranton Counseling Center. Tr. 428. A mental status examination on that date was normal. Id. Jenkins's mood was euthymic and his affect appropriate; he was friendly, alert, cooperative, and his concentration and attention were good; he was oriented and non-psychotic; he denied drug and alcohol use; he denied homicidal and suicidal ideations; and he stated that his medications were helpful. Id. Jenkins stated that he was "feeling better since his hospitalization." Id. It was noted that Jenkins's mood was stable but that he was still having marital problems. Id. The physician recommended "couples counseling." Id.

On February 8, 2007, Jenkins had an appointment at the Scranton Counseling Center. Tr. 426. A mental status examination on that date was normal. Id. Jenkins's mood was euthymic and his affect appropriate; he was friendly, alert, cooperative, and his concentration and attention were good; he was oriented and non-psychotic; he denied drug and alcohol use; he denied homicidal and suicidal ideations; and he stated that his medications were helpful. Id. Jenkins stated that he "went to 3 couples counseling sessions" and he was "feeling better when he takes his meds consistently." Id.

On March 8, 2007, Jenkins had an appointment at the Scranton Counseling Center. Tr. 514. A mental status examination on that date was normal. Id. Jenkins's mood was euthymic and his affect appropriate; he was friendly, alert, cooperative, and his concentration and attention were good; he was oriented and non-psychotic; he denied drug and alcohol use; he denied homicidal and suicidal ideations; and he stated that his medications were helpful. Id. It was noted that Jenkins's mood was stable, that he was pleasant and compliant with his medications. Id.

On March 27, 2007, Jenkins had an appointment at Scranton Temple Residency Program Faculty Service, Scranton, regarding his HIV infection. Tr. 468-470. The attending physician was Dr. Pancoast. Id. It was noted that Jenkins was taking no HIV medications and his HIV infections

14

were stable ("a non-progressor for an extended time"). Tr. 470  His last CD4 count was 414 and his last viral load was less than 6000. Id.  Dr. Pancoast stated that Jenkins's "viral load is low, CD4 count is high and his general health is excellent." Id.  When Dr. Pancoast or a nurse conducted a review of Jenkins's systems he denied the following: constitutional, eye, nasal, cardiovascular, respiratory, gastrointestinal, urinary, skin, hair, nail, neurologic and hematologic symptoms. Tr. 468.  He told either the nurse or Dr. Pancoast that he was under stress. Id.  A physical examination of Jenkins revealed normal findings. Tr. 468-469.

On April 3, 2007, Jenkins had an appointment at the Scranton Counseling Center. Tr. 512. A mental status examination on that date was normal. Id.  Jenkins's mood was euthymic and his affect appropriate; he was friendly, alert, cooperative, and his concentration and attention were good; he was oriented and non-psychotic; he denied drug and alcohol use; he denied homicidal and suicidal ideations; and he stated that his medications were helpful. Id.

On May 18, 2007, Frederick B. Myers, M.D., reviewed Jenkins's medical records on behalf of the Bureau of Disability Determination and concluded that Jenkins had the physical ability to engage in the full range of medium work. Tr. 438-443. Dr. Myers indicated that Jenkins was infected with the HIV virus but that he had no opportunistic infections,[20] his physical examinations were normal and his viral load was low. Tr. 443.

On June 12, 2007, John Gavazzi, Psy.D., a psychologist, reviewed Jenkins's medical records on behalf of the Bureau of Disability Determination and concluded that Jenkins suffered from bipolar disorder and impulse control disorder, not otherwise specified. Tr. 444-459.  Dr.

---

20.     There are many germs (bacteria, viruses, etc.) that are normally found in the body.  Our immune system if healthy generally keeps them in check.  When the immune system is weakened by the HIV virus these germ can take advantage of that weakened condition.  These type of infections are called opportunistic infections.

Gavazzi further found that Jenkins was only moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. Tr. 457-458.  Dr. Gavazzi stated that Jenkins "can perform simple, routine, repetitive work in a stable environment. He can make simple decisions" and "[h]e can sustain an ordinary routine without special supervision." Tr. 459.  Dr. Gavazzi also found that Jenkins was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." Id.

On August 27, 2007, Jenkins had an appointment at Scranton Temple Residency Program Faculty Service, Scranton, regarding his HIV infection. Tr. 471-472.  The attending physician was Dr. Pancoast. Id.  It was noted that Jenkins was taking no HIV medications and he was asymptomatic. Tr. 471  His last CD4 count was 307 and his last viral load was 9231. Id.  When Dr. Pancoast, another physician or a nurse conducted a review of Jenkins's systems he denied the following: constitutional, eye, nasal, cardiovascular, respiratory, and gastrointestinal symptoms. Tr. 471. A physical examination of Jenkins revealed normal findings. Id.

On November 19, 2007, Jenkins had an undetectable HIV viral load and his CD4 count was 279. Tr. 463.

On January 30, 2008, Jenkins was evaluated by a psychiatrist[21] at the Scranton Counseling Center. Tr. 489-503.  During that evaluation Jenkins admitted his history of drug and alcohol abuse and stated that his drug of choice was marijuana.[22] Tr. 494.  Jenkins further stated that he last used drugs or alcohol 2 years prior to the evaluation. Id.  He also revealed his criminal history. Tr. 495.

---

21.    The signature of the psychiatrist is illegible. Tr. 256.

22.    Previously Jenkins reported that his drug of choice was crack.

A mental status examination by the psychiatrist was essentially normal. Tr. 499.  It was observed that Jenkins had no abnormal movements or behavior of any kind; Jenkins was cooperative and his speech was normal, his affect was appropriate and his thought processes were coherent; Jenkins denied any unusual feelings, experiences, beliefs, paranoid thoughts or grandiose ideas and no psychotic thought processes of any kind were noted; Jenkins denied any kind of obsessive compulsive behavior, he denied any suicidal or homicidal ideations, and he denied any kind of hallucinations or illusions. Tr. 2499-500.  Jenkins was oriented to person, place and time, his memory was intact, his concentration was adequate, and he had good judgment. Id.  Jenkins further denied any problems with impulse control. Id.  The only negative observations were that his mood was anxious and he had limited insight regarding his problems. Id.  The psychiatrist concluded that Jenkins suffered from bipolar disorder, not otherwise specified, and impulse control disorder, not otherwise specified, and could not rule out intermittent explosive disorder and anti-social personality disorder. Tr. 501.  He further gave Jenkins a Global Assessment of Functioning (GAF) score of 55, representing moderate symptoms. Id.  Jenkins was  prescribed psychotherapy and the drugs Depakote and Prozac. Tr. 502-503.

On February 27, 2008, Jenkins had an appointment at the Scranton Counseling Center. Tr. 506. A mental status examination on that date was normal. Id.  Jenkins's mood was euthymic and his affect appropriate; he was friendly, alert, cooperative, and his concentration and attention were good; he was oriented and non-psychotic; he denied drug and alcohol use; he denied homicidal and suicidal ideations; and he stated that his medications were helpful. Id.  Jenkins reported no side effects from his medications. Id.  The medical provider[23] meeting with Jenkins noted that Jenkins was "pleasant" and "insightful." Id.

---

23 .    The progress note was signed by a physician but the signature is illegible.

On March 4, 2008, Jenkins had an appointment at Scranton Temple Residency Program Faculty Service, Scranton, regarding his HIV infection. Tr. 473-474. The attending physician was Dr. Pancoast. Id. It was noted that Jenkins was taking medications, that his condition had improved, and that he had no medication side effects. Id. His CD4 count was 279 and his viral load was less than 48.[24] Id. Jenkins denied any associated signs or symptoms. Id. When Dr. Pancoast, another physician or a nurse conducted a review of Jenkins's systems he denied the following: constitutional, eye, nasal, cardiovascular, respiratory, gastrointestinal, genital, urinary, skin, hair, nail, neurologic and psychiatric symptoms. Id. Physical examination findings were essentially[25] normal. Id. It was further noted as follows: "Patient's attitude is cooperative. Mood is normal. Affect is normal. Thought processes demonstrate coherence and logic. Clear flowing thought processes. Suicidality: none. Homicidality: none. Dangerousness: none. Attention span and concentration are normal. Judgment is realistic. Insight is appropriate." Id.

On March 26, 2008, Jenkins had an appointment at the Scranton Counseling Center. Tr. 505. A mental status examination on that date was normal. Id. Jenkins's mood was euthymic and his affect appropriate; he was friendly, alert, cooperative, and his concentration and attention were good; he was oriented and non-psychotic; he denied drug and alcohol use; he denied homicidal and suicidal ideations; and he stated that his medications were helpful. Id. Jenkins reported no side effects from his medications. Id. The medical provider[26] meeting with Jenkins noted that Jenkins was "feeling better" and his "mood stable." Id.

---

24.    It was stated that the viral load was undetectable and that Jenkins was without HIV symptoms. Tr. 474 and 476.

25.    Jenkins's blood pressure was slightly elevated at 140/82.

26.    The progress note was signed by a physician but the signature is illegible.

There is a brief note in the record indicating that on March 28, 2008, Jenkins came down with bronchitis and was prescribed an antibiotic. Tr. 475. It appears that Jenkins recovered from this illness because at an appointment with Scranton Temple Residency Program Faculty Service on May 8, 2008, it was noted that Jenkins appeared healthy, well nourished, well groomed with no signs of acute distress present and alert and oriented. Tr. 477. Furthermore, physical examination findings were essentially normal. Tr. 477-478. His CD4 count was 380 and his viral load was less than 50. When Dr. Pancoast, another physician or a nurse conducted a review of Jenkins's systems he denied the following: constitutional, eye, nasal, cardiovascular, respiratory, gastrointestinal, urinary, skin, hair, nail, neurologic, psychiatric and hematologic symptoms. Id.

On May 15, 2008, Jenkins had an appointment at Scranton Temple Residency Program Faculty Service, Scranton, regarding his HIV infection. Tr. 479-480. The attending physician's signature is illegible. Id. It was noted that Jenkins was taking medications as prescribed and that he had no medication side effects. Id. His CD4 count was 380 and his viral load was less than 50. Id. Physical examination findings were essentially normal. Id. When the physician or nurse conducted a review of Jenkins's systems he denied the following: constitutional, eye, nasal, cardiovascular, respiratory, gastrointestinal, urinary, neurologic, psychiatric and hematologic symptoms. Id.

On August 19, 2008, Jenkins had an appointment at the Scranton Counseling Center. Tr. 488. A mental status examination on that date was normal. Id. Jenkins's mood was euthymic and his affect appropriate; he was friendly, alert, cooperative, and his concentration and attention were good; he was oriented and non-psychotic; he denied drug and alcohol use; he denied homicidal and suicidal ideations; and he stated that his medications were helpful. Id. Jenkins reported no side

19

effects from his medications. Id. The medical provider[27] meeting with Jenkins noted that Jenkins was "doing much better," "compliant with meds daily," and his "[t]houghts [were] clear, organized and mature." Id.

On September 16, 2008, Jenkins had an appointment at the Scranton Counseling Center. Tr. 487. A mental status examination on that date was normal. Id. Jenkins's mood was euthymic and his affect appropriate; he was friendly, alert, cooperative, and his concentration and attention were good; he was oriented and non-psychotic; he denied drug and alcohol use; he denied homicidal and suicidal ideations; and he stated that his medications were helpful. Id. Jenkins reported no side effects from his medications. Id. The medical provider[28] meeting with Jenkins noted that he saw "a dramatic improvement in Rod's level of maturity, reasoning and judgment." Id.

On September 24 and 29, 2008, Jenkins underwent a neuropsychological evaluation by John R. Harvey, Ph.D., a licensed psychologist with Allied Services, Scranton. Tr. 519-532. Jenkins was referred to Dr. Harvey by the Lackawanna County Office of Public Assistance to determine Jenkins's employability. There is no indication in Dr. Harvey's report of the evaluation that Dr. Harvey reviewed Jenkins's medical and psychiatric treatment records. It appears that the bulk of the background information set forth in the report was provided to Dr. Harvey by Jenkins. Jenkins told Dr. Harvey that he had a "history of delusional type activity, which occurred well after he refrained from drug use." Tr. 521. Jenkins further told Dr. Harvey that "[h]e heard voices as recent as a few weeks ago." Id.

_____

27.   The progress note was signed by a physician but the signature is illegible.

28.   The progress note was signed by a physician but the signature is illegible.

Dr. Harvey administered a battery of intelligence tests and found that Jenkins's "overall intellectual ability is in the low average range" and that Jenkins "does not meet the diagnostic criteria for a specific attentional disorder." Tr. 524. Dr. Harvey stated that Jenkins has "weaknesses with expressive and receptive language and verbal memory . . .[and] immediate and working memory." Id. Dr. Harvey stated that Jenkins "has strengths with perceptual reasoning ability, cognitive flexibility, visual memory, serial recall and visualization." Id.

Dr. Harvey diagnosed Jenkins as suffering from bipolar disorder, psychotic; receptive/expressive language disorder; a history of substance abuse in current remission" and stated that "[t]here is cause to rule out antisocial personality disorder due to his lack of remorse and not following social rules as well as hurting others." Tr. 525. Dr. Harvey in conclusory fashion stated that Jenkins "is unable to engage in meaningful employment." Id. Dr. Harvey did not provide a function-by-function assessment of Jenkins's mental work abilities as did Drs. Barrett, Nourian and Gavazzi.

**Discussion**

The administrative law judge at step one of the sequential evaluation process found that Jenkins had engaged in substantial gainful work activity since February 27, 2007, the application date, but that the activity was an unsuccessful attempt to return to work. Tr. 15.

At step two of the sequential evaluation process, the administrative law judge found that Jenkins had the following severe impairments: bipolar disorder and a history of personality disorder. Tr. 15. The administrative law judge found that Jenkins's HIV disease was a non-severe impairment.[29] Id.

---

29.   An impairment is "severe" if it significantly limits an individuals ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing,

(continued...)

At step three of the sequential evaluation process the administrative law judge found that Jenkins's impairments did not individually or in combination meet or equal a listed impairment. Tr. 15-19.

At step four of the sequential evaluation process the administrative law judge found that Jenkins could not perform any prior work but had the residual functional capacity to perform unskilled work at all exertional levels but with non-exertional restrictions. Tr. 19 and 22. The administrative law judge limited Jenkins to repetitive work in a stable environment; that was predictable and not subject to frequent changes; that was removed from significant contact with the public; that would not involve a great deal of independent judgment and decision-making; and that only involved simple, oral communication rather than written communication. Based on that residual functional capacity, and Jenkins's age, education and work background, and the testimony of a vocational expert, the administrative law judge found at step five of the sequential evaluation process that Jenkins could perform unskilled work as a bench packager, assembler, and bench inspector, and that there were a significant number of such jobs in the local, state and national economies.[30] Tr. 23.

---

29.   (...continued)
speaking, and remembering. Id.   An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

30.   The Dictionary of Occupational Titles (DOT) reveals that many of these positions are at the sedentary and light exertional work level. See, e.g., DOT Number 781.667-010, Assembler, Dictionary of Occupational Titles (4th Ed., Rev. 1991), United States Department of Labor,http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT07FH.HTM (Last accessed December 22, 2011).The Social Security Administration has taken administrative notice of the reliability of the job information contained in the Dictionary of Occupational Titles . . . and often relies upon it . . . ." Burns v. Barnhart, 312 F.3d 113, 126 (3d Cir. 2002). The Dictionary of Occupational Titles sets forth job information, including the exertional and skill level necessary to perform an occupation.

The administrative record in this case is 532 pages in length and we have thoroughly reviewed that record. The administrative law judge did an adequate job of reviewing Jenkins's vocational history and medical records in his decision. Tr. 15-24. Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 12, Brief of Defendant. Jenkins's primary argument is that the administrative law judge erred by rejecting the opinion of Dr. Harvey and relying on the opinion of Drs. Barrett, Nourian and Gavazzi. Jenkins also argues that the administrative law judge erred in finding that he was not credible. We have thoroughly reviewed the record in this case and find no merit in Jenkins's arguments.

Initially it should be noted that no treating physician has indicated that Jenkins is unable to engage in full-time employment because of his physical and mental impairments. Dr. Harvey, although an examining psychologist, was not a treating psychologist and no special deference is due his opinion as opposed to Drs. Barrett, Nourian and Gavazzi. Furthermore, Dr. Harvey's opinion regarding Jenkins's ability to work is conclusory and he fails to provide a function-by-function assessment of Jenkins's mental work abilities in contrast to the assessments of Dr. Barrett, Nourian and Gavazzi. Jenkins, in his brief, focuses on his mental limitations and does not challenge the administrative law judge's decision as to his physical abilities. Even if Jenkins did challenge the decision of the administrative law judge regarding his physical abilities, the medical records reveal that Jenkins's HIV infection was well-controlled. Furthermore, the treatment records from Scranton Counseling Center show that Jenkins repeatedly had a normal mental status and at most moderate limitations in mental functioning.

The administrative law judge stated that Jenkins's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform work as a bench packager, assembler, and bench inspector.

The administrative law judge was not required to accept Jenkins's claims regarding his limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."  Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").  Because the administrative law judge observed Jenkins when he testified at the hearing on June 16, 2009, the administrative law judge is the one best suited to assess the credibility of Jenkins

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


Dated: December 28, 2011

_____
United States District Judge

## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RODERICK CLINTON JENKINS, | : | |
| Plaintiff | : | No. 4:10-CV-2410 |
| | : | |
| v. | : | (Judge Nealon) |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

### ORDER

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

1.  The Clerk of Court shall enter judgment in favor of the Commissioner and against Roderick Clinton Jenkins as set forth in the following paragraph.

2.  The decision of the Commissioner of Social Security denying Roderick Clinton Jenkins supplemental security income benefits is affirmed.

3.  The Clerk of Court shall **CLOSE** this case.

Dated: December 28, 2011

United States District Judge